IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MONIQUE R. NAGEL,<br>    PLAINTIFF<br><br>Vs.<br><br>RAM INDUSTRIAL SERVICES, LLC,<br>INDUSTRIAL SERVICE SOLUTIONS,<br>INC.,<br>INSPERITY PEO SERVICES, L.P.,   AND<br>FRANK SETLAK,<br>    DEFENDANTS | : CIVIL ACTION<br>:<br>: NO.<br>:<br>: JURY TRIAL DEMANDED<br>:<br>:<br>:<br>:<br>: |

<u>COMPLAINT</u>

<u>Jurisdiction</u>

1.      This Court has jurisdiction of the instant Fair Labor Standards Act

(FLSA) and Pennsylvania Wage Payment and Collection Law action under 28

U.S.C.S. §§ 1331 and 1367(a), 29 U.S.C.S. § 216(b), and 43 P.S. § 260.9a(b).

<u>The parties</u>

2.      Plaintiff ("Plaintiff" or "Ms. Nagel") is an adult individual who, at all

times material hereto, has resided in Dillsburg, York County, Pennsylvania.

3.      Defendant RAM Industrial Services, LLC ("RAM") is a foreign

limited liability company which, at all times material hereto, has operated a

manufacturing facility at 2850 Appleton St # D, Camp Hill, Cumberland County, Pennsylvania 17011.

4.     RAM, at all times material hereto, has been in the business of distributing and servicing electric motors, pumps, and controls.  During this time it has had Pennsylvania facilities in Camp Hill, Carrolltown, Erie, and Pittsburgh.

5.     At all such times, RAM has been an "employer" within the meaning of the FLSA, 29 U.S.C.S. § 203(d), and an "enterprise engaged in commerce" under 29 U.S.C.S. § 203(s) (1).

6.     Defendant Industrial Service Solutions, Inc. ("ISS") is a Florida corporation having its principal place of business at 10687 NW 123 Street Road Medley, FL 33178.  ISS is the parent company of RAM and, at all times material hereto, has done business in Pennsylvania and has taken an active part in the management and supervision of the operations of RAM.

7.     ISS, too, at all such times, has been an "employer" within the meaning of the FLSA, 29 U.S.C.S. § 203(d), and an "enterprise engaged in commerce" under 29 U.S.C.S. § 203(s) (1).

8.     Defendant Insperity PEO Services, L.P. ("Insperity") is, based upon Plaintiff's information and belief, a Texas limited partnership having its office and principal place of business at 19001 Crescent Springs Drive, Kingwood, TX 77339-3802.  At all times material hereto, Insperity has done business in

2

Pennsylvania and was a co-employer with ISS as to RAM, and responsible for payroll, tax withholding, and various human resource functions.

9.     Defendant Frank Setlak ("Setlak") was, at all times material hereto, senior vice president of RAM, having his office at RAM's Camp Hill facility, and, for all intents and purposes has been the highest-ranking officer in RAM.  During this time Setlak has managed all aspects of RAM's business, including all four of RAM's facilities—located in Camp Hill, PA, Erie, PA, Pittsburgh, PA, and Carrolltown, PA—as well as production, finance, hiring, firing, raises, and employee discipline.

10.     At all times material hereto, RAM, ISS, Insperity, and Setlak were "employers" within the meaning of the FLSA, 29 U.S.C.S. § 203(d), and RAM, ISS, and Insperity were "enterprise[s] engaged in commerce" under 29 U.S.C.S. § 203(s) (1).

11.     At all times material hereto, Setlak acted as an officer and agent of RAM and ISS.

12.     At all times material hereto, ISS, through its subsidiaries, has provided equipment and applications, valves, actuation, motors and generators, pumps, compressors, coolers, boilers, heat exchangers, mixers, electrical-equipment controls, and peripheral equipment.

13.     At all times material hereto, Insperity has provided human resources and administrative services to small and medium-sized businesses.  As such, Insperity has been expert in the full range of human resource matters, including compensation of employees.

<u>Background</u>

14.     On May 15, 2017 RAM/ISS and Insperity hired Plaintiff as "HR generalist," a position that RAM/ISS told Ms. Nagel was exempt from overtime pay, at an annual salary of $46,000.  Throughout her employment with RAM/ISS/Insperity, Ms. Nagel worked out of the Camp Hill, PA facility.

15.     At the time Ms. Nagel began working for RAM/ISS/Insperity, Setlak had nearly twenty years' experience as either a plant manager or vice-president of operations at a variety of companies.

16.     Neither RAM/ISS nor Insperity ever paid Ms. Nagel overtime pay or informed her that she was entitled to overtime pay.

17.     From the beginning of Ms. Nagel's employment with RAM/ISS/Insperity through March 2019, it was the policy of RAM/ISS/Insperity to count paid time-off, including vacation time and holidays, toward hours worked for overtime purposes.

18.     In her position as HR generalist, Ms. Nagel did not supervise any employee of RAM/ISS, and no employee of RAM/ISS ever reported to her.  She had no staff to assist her.

19.     Ms. Nagel's supervisor was RAM senior vice-president , Frank Setlak, who made most decisions in human resource matters, sometimes conferring with or referring them to ISS, Insperity, or vendors of HR-related supporting software, bypassing Ms. Nagel.

20.     After about three months in this job, Ms. Nagel realized that she was performing the work of an administrative assistant to Setlak.

21.     Ms. Nagel spent the majority of her time at work in maintaining time cards and submitting them to Insperity.

22.     During her employment at RAM, Ms. Nagel was not responsible for managing HR functions; on the contrary, Frank Setlak was responsible for managing such functions, in consultation with ISS.

23.     When Ms. Nagel began working at RAM, Setlak told her that she would have to work 50-55 hours a week in order to be successful in her job.  In fact, throughout her employment at RAM, Ms. Nagel generally showed up early and left late.

24.     Setlak told Ms. Nagel explicitly that she was in a "generalist" position, not in a manager's position.  In fact, it was Setlak who had changed the

name of the position into which Ms. Nagel was hired from "HR manager" to "HR generalist."

25.     Setlak told employees not to even go to Ms. Nagel with HR issues, but to go to him instead.

26.     Ms. Nagel did not have authority to formulate, affect, interpret, or implement management policies or operating practices.  Rather, she merely applied well-established techniques, procedures, or specific standards, as those techniques, procedures and standards were explained to her and enforced by Frank Setlak.  Setlak frequently reminded Ms. Nagel that all such policies were in place and wouldn't change.  Much, if not most of her work consisted of clerical and secretarial, and recurrent, routine work.

27.     Rather than allow Ms. Nagel to field, handle, and resolve HR issues herself, Setlak would cut her out of the process by bypassing her, going straight to supervisors himself, or conferring with ISS.  He also instructed supervisors to go to him with HR issues, rather than to Ms. Nagel.  Ms. Nagel had no discretion to handle HR issues; rather, she was reduced to carrying out Setlak's instructions. Setlak also instructed Ms. Nagel not to communicate with the HR director at ISS.

28.     Ms. Nagel, throughout her employment at RAM, did not perform work that affected RAM's operations to a substantial degree.  She had no authority to commit RAM or ISS in any matter that would have significant financial impact.

29.     Setlak kept tight control of Ms. Nagel's time, requiring her to get permission from him in advance, for instance, to have a long lunch with a friend or attend a funeral.

30.     Ms. Nagel's primary duty did not include the exercise of discretion and independent judgment with respect to matters of significance.

31.     Ms. Nagel had no authority to waive or deviate from any policy or procedure.  Setlak repeatedly made this abundantly clear to her.

32.     Ms. Nagel had no authority to negotiate and bind the company on significant matters.

33.     Ms. Nagel was not involved in planning long- or short-term business objectives.  In fact, she was so little involved in management meetings that she simply stopped attending them. Setlak merely treated her condescendingly, marginalized, and humiliated her in those meetings.

34.     Ms. Nagel did not provide consultation or expert advice to management.  Any consultation or expert advice was provided by Setlak directly, as was usually the case, or by Insperity to RAM/ISS.

35.     Ms. Nagel, in her position at RAM/ISS, did not investigate or resolve matters of significance on behalf of RAM/ISS management.  Typically, Frank Setlak would himself contact supervisors directly to deal with employee issues, usually not even informing Ms. Nagel that such an issue had been addressed.

36.     Ms. Nagel did not represent RAM/ISS in handling complaints, arbitrating disputes, or resolving grievances.  Setlak handled these matters also.

37.     Plaintiff did not carry out major assignments in conducting the operations of RAM's/ISS's business.

38.     Ms. Nagel did not have the authority to make independent choices, free from the immediate direction or supervision of Frank Setlak.

39.     Ms. Nagel was not a human resources manager who formulated, interpreted, or implemented employment policies.  She did not have the authority or discretion to carry out such functions.  Such functions were carried out by Frank Setlak or staff at ISS and/or Insperity.

40.     Early in her tenure at RAM/ISS, Ms. Nagel discussed her concerns about her "exempt" status with a payroll employee at Insperity with whom she worked.

41.     After about six to eight months on the job, Ms. Nagel took up the issue of her "exempt" status with Frank Setlak, at which time Setlak dismissed her concerns.

42.     Ms. Nagel again attempted to address her concerns with Setlak during her first-year performance evaluation, in August 2018.  At that time she presented Setlak with an article on exemption designations from the web site of the Society of Human Resource Managers ("SHRM"), telling him that there were requirements

that needed to be met to qualify an employee as exempt, and that it was a federal

law.  Again, Setlak didn't want to discuss the issue and changed the subject, telling

Ms. Nagel that he would review the article later.

43.    A few months later, Ms. Nagel again asked Setlak about the issues in

the SHRM article, but Setlak again dismissed her concerns.

44.    Concluding that further discussion with Setlak was futile, and that she

would get the same treatment from ISS, and insamuch as Insperity was the co-

employer, Ms. Nagel, during the winter of 2018-19, called an HR representative at

Insperity.   The representative encouraged Ms. Nagel to continue scanning her

building access card when she left the building, in order to create a "time stamp" in

the system to keep track of her hours.

45.    Ms. Nagel did not submit a formal complaint at that time because she

feared retaliation.

46.    At some point during 2019, Ms. Nagel took her concerns to RAM's

chief financial officer, telling him that her position was, at most, that of an

administrative assistant, that she should not be classified as exempt, and that the

federal requirements for exempt status could not be met in her case.

<u>COUNT I</u>
<u>ALL DEFENDANTS</u>
<u>VIOLATION OF FAIR LABOR STANDARDS ACT,</u>
<u>29 U.S.C.S. § 207</u>

47.    Each paragraph above is incorporated herein.

48.     Defendants' failure to pay Ms. Nagel overtime to which she was entitled is a violation of the Fair Labor Standards Act, specifically 29 U.S.C.S. § 207.

49.     Based on the position she held and the duties she carried out, Ms. Nagel was not exempt from her employers' obligation under the FLSA to pay her time-and-a-half for overtime for each hour she worked over forty hours in any week, including weeks during which her vacation and paid time off, combined with hours worked, exceeded forty hours (in accordance with ISS/RAM's policy).

50.     Ms. Nagel has estimated, based on access card data, her normal work schedule, and her records of her paid time off, that she worked 856.20 overtime hours.  Based on Ms. Nagel's hourly rate based on her annual salary of $46,000 and time-and-a-half for overtime hours, Ms. Nagel is entitled to $28,254.60  in overtime pay, which the Defendants have not paid her.

51.     Ms. Nagel is also entitled, under 29 U.S.C.S. § 216(b), to an additional like amount, $28,254.60, in liquidated damages, for a total of $56,509.20.

52.     Ms. Nagel has also incurred substantial attorney's fees in prosecuting this action.

53.     Plaintiff demands a jury trial on her claims.

WHEREFORE, Plaintiff Monique R. Nagel demands judgment against the Defendants in the amount of $56,509.20, plus all applicable interest and an award of attorneys' fees under 29 U.S.C.S. § 216(b).

COUNT II
ALL DEFENDANTS
PA. WAGE PAYMENT AND COLLECTION LAW
43 P.S. §§ 260.1 — 260.45

54.     Each paragraph above is incorporated herein.

55.     This Court has jurisdiction of this claim under 28 U.S.C. § 1367(a) and 43 P.S. § 260.9a(b) .

56.     All Defendants are "employers" under the Pennsylvania Wage Payment and Collection Law (WPCL), 43 P.S. § 260.2a.

57.     The WPCL provides:

Every employer shall pay all wages, other than fringe benefits and wage supplements, due to his employes on regular paydays designated in advance by the employer. Overtime wages may be considered as wages earned and payable in the next succeeding pay period. All wages, other than fringe benefits and wage supplements, earned in any pay period shall be due and payable within the number of days after the expiration of said pay period as provided in a written contract of employment or, if not so specified, within the standard time lapse customary in the trade or within 15 days from the end of such pay period.

43 P.S. § 260.3(a).

58.     In failing to pay overtime pay to Plaintiff when due, Defendants have violated the WPCL, 43 P.S. § 260.3(a).

59.     The WPCL further provides that "Actions by an employe . . . to recover unpaid wages and liquidated damages may be maintained in any court of competent jurisdiction[.]"  43 P.S. § 260.9a(b).

60.     Plaintiff contends that under the circumstances detailed above, Defendants can make no good-faith contest or dispute of Plaintiff's wage claims, or assert in good-faith a right of set-off or counterclaim.  Therefore, Plaintiff is entitled to liquidated damages of 25 % of her unpaid overtime wages, amounting to $7,063.65.

61.     Section 260.9a(f) mandates an award of reasonable attorney's fees to the plaintiff, "in addition to any judgment awarded to the plaintiff."  43 P.S. § 260.9a(f).

62.     Plaintiff demands a jury trial on this claim.

WHEREFORE, Plaintiff demands judgment in the amount of $35,318.25, plus attorney's fees, and all applicable interest and costs.


--REMAINDER OF PAGE INTENTIONALLY BLANK--

Respectfully submitted,

*/s/ Brian C. Caffrey, Esq.*
_____
Brian C. Caffrey
PA ID #42667
Attorney for Plaintiff
Scaringi & Scaringi, P.C.
2000 Linglestown Road, Suite 106
Harrisburg, PA 17110
717-657-7770: phone
717-657-7797:  fax
May 22, 2020                    brian@scaringilaw.com